IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERELL ADAMS-DEVONISH,

    *Plaintiff*,

    v.

KeHE DISTRIBUTORS,

    *Defendant.*

Civil No.: 1:24-cv-01654-JRR

<u>**MEMORANDUM OPINION**</u>

Pending before the court is Defendant's Motion for Summary Judgment (ECF No. 40, the "Motion") and Plaintiff's Motion for Leave to File Surreply in Opposition to Defendant's Motion for Summary Judgment (ECF No. 52, the "Motion for Leave to File Surreply"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons set forth below, by accompanying order, the Motion and the Motion for Leave to File Surreply will be granted.

## I.    <u>BACKGROUND</u>

*Pro se* Plaintiff Terell Adams-Devonish, an African American man who suffers from gastritis and ulcers, initiated this action in the Circuit Court for Cecil County, Maryland (Case No. C-07-CV-24-000095), on February 26, 2024, against Defendant KeHE Distributors, Inc. ("KeHE"), his previous employer. (ECF No. 4.) Plaintiff alleges that Defendant discriminated against him during his employment in violation of (1) Title VII, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); and (2) Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111, *et seq.* ("ADA"). *Id.* ¶ 33. Plaintiff asserts claims against Defendant for race and gender discrimination under Title VII, disability discrimination under the ADA, and retaliation under both Title VII and

the ADA.  *Id.*  Plaintiff asserts that Defendant's conduct caused him "significant financial ramifications, humiliation, outrage, and mental anguish for which [he] seeks compensatory damages[]" in the amount of $40 million.  *Id.* ¶¶ 31–32.

Defendant removed the action to this court on June 7, 2024 (ECF No. 1), and filed the Motion on March 21, 2025.  (ECF No. 40.)  Plaintiff filed a response to the Motion on March 23, 2025 (ECF No. 43), and Defendant filed its reply on April 7, 2025.  (ECF No. 50.)  On April 8, 2025, Plaintiff filed a Motion for Leave to File Surreply (ECF No. 52) to which Defendant filed an opposition on April 22, 2025.  (ECF No. 57.)

## II.    UNDISPUTED FACTS

Except where noted, the following facts are undisputed.[1]

### A. Plaintiff's Employment with KeHE

On October 7, 2021, Plaintiff was hired by KeHE, a national wholesale food distributor, as a Warehouse Dry Case Selector ("Selector") at the North East, Maryland distribution center.  (ECF No. 4 ¶¶ 1, 4; ECF No. 40-1 at pp. 7, 9; ECF No. 40-7, Adams-Devonish Dep. Tr. 163:4–6.)  Selectors are responsible for fulfilling customer orders, which involves pulling products from warehouse shelves, including heavy items, and readying them for shipment.  (Summerville Decl., ECF No. 40-8 ¶ 3.)  At the beginning of each shift, each Selector receives a book of customer orders to fill.  *Id.* ¶ 4.  Once a Selector completes a book of orders, they receive another book until all books for the day are complete.  *Id.* ¶ 5.  As the remaining number of books for the day decreases, management may begin to release Selectors to go home on a first-in, first-out basis, with Selectors from earlier shifts being released before Selectors on later shifts.  *Id.* ¶ 6.

---

[1] With the exception of reference to Plaintiff's deposition testimony, the court's reference to all filings refers to the internal CM/ECF pagination.

**B. KeHE's Employment Policies**

At the start of employment, all KeHE employees are required to review, and agree to comply with, the Employee Handbook (the "Handbook"). (Gardner Decl., ECF No. 40-2 ¶ 3.) Plaintiff signed an Acknowledgment of Employee Handbook on October 4, 2021. (ECF No. 40-3.) The Acknowledgement includes that the employee agrees he is "obligated to read and comply with the policies and rules contained in [the] Handbook and any revisions made to it by authorized officials of KeHE Distributors, LLC." *Id.* The Handbook sets forth workplace expectations as to general rules and standards that all employees are expected to follow. (Handbook, ECF No. 40-2 at pp. 43–47.) The Handbook also includes corrective action guidelines "to improve and prevent a recurrence of undesirable behavior and/or performance issues." *Id.* at p. 43. Notwithstanding the corrective action guidelines, the Handbook includes a list of certain misconduct that may result in immediate termination of employment, including "[w]alking off the job without prior approval from a supervisor, excluding legally protected activity" and "[i]nsubordination – refusal to follow the direction of a supervisor or continuing to refuse this direction after it is explained again, excluding legally protected activity." *Id.* at p. 44.

Concerning reasonable accommodations and compliance with the ADA, the Handbook provides:

> The Company will make reasonable accommodation(s) to the known physical or mental limitations of qualified applicants or employees with disabilities to enable them to perform the essential job duties or participate in other Company functions in accordance with applicable law. The Company engages in an interactive process with any employee requesting accommodation to determine the availability of an appropriate reasonable accommodation. The Company is not obligated to make accommodation(s) that would impose an undue hardship or cause a direct threat to workplace safety. Additionally, where there are two or more effective reasonable accommodations, the Company will choose which accommodation to provide the employee.

(Handbook, ECF No. 40-2 at p. 22.) Employees seeking disability accommodation are encouraged to contact the Human Resources Department. *Id.*

In addition to reviewing the Handbook, employees working at the North East distribution center are required to follow the Warehouse Operations and Attendance Policy (the "Attendance Policy"). (Gardner Decl., ECF No. 40-2 ¶ 6.) The Attendance Policy form was also signed by Plaintiff on October 4, 2021. (Attendance Policy, ECF No. 40-3 at pp. 4–7.) The Attendance Policy applies to all hourly, non-exempt employees working in the distribution center. *Id.* at p. 4. It defines "Leaving Early" as "[l]eaving the work station or clocking out before the end of the scheduled work shift and any required overtime without pre-approval from management. An employee is expected to be at his/her work station until his/her scheduled stop time including any required overtime." *Id.* A "Scheduled Work Shift" is defined as "[a] period of time that an employee is scheduled to work based upon a documented schedule, or where no schedule exists, upon the business needs and expectations as set by their respective department." *Id.* The Attendance Policy specifies that "[a]bsences, tardiness, and/or leaving early when not pre-approved, even if Paid Time Off ('PTO') is available, are considered 'unexcused' and may be considered as a disciplinary issue." *Id.*

With regard to notification, employees prevented or delayed from going into work must call their supervisor or manager (or in distribution centers where there is a sick hotline, the sick hotline) at least one hour prior to their scheduled start time. (Attendance Policy, ECF No. 40-3 at p. 4.) "It is not acceptable to call a fellow employee, including a Lead, HR, or Warehouse Admin, who is not a member of management." *Id*. at p. 5. An employee who fails to notify a supervisor or manager in a timely manner may be subject to disciplinary action, including termination. *Id.*

4

### C. Plaintiff's Allegations of Discrimination

Plaintiff alleges that while he was employed by Defendant, he was subject to discrimination based on his race, gender, and disability, and retaliated against for engaging in protected activity. (ECF No. 4 ¶¶ 3, 24.)  Plaintiff points to the following interactions to support his claims.

#### a. *January 2022 Complaint Regarding Pay*

Plaintiff failed to receive holiday pay for the 2022 New Year's Day holiday and, instead, was charged sick time despite working the days before and after the holiday.  (ECF No. 4 ¶ 6; ECF No. 40-7, Adams-Devonish Dep. Tr. 189:1–189:11.)  As confirmed to Plaintiff by Rebecca Salhab, Senior Director of Human Resources, an employee is eligible to receive holiday pay for an intervening holiday if an employee works his scheduled shift the day before and the day after the holiday.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 188:9–11.)  On or about January 14, 2022, after reviewing his paystubs, Plaintiff complained to Ms. Salhab through Defendant's Ethical Advocate hotline; his pay was corrected approximately three weeks later.  (ECF No. 4 ¶ 7; ECF No. 40-1 at p. 10; ECF No. 40-7, Adams-Devonish Dep. Tr. 188:22–189:3, 192:22–193:3.)

Plaintiff alleges that only Black employees were not given holiday pay and when he told a manager "that's illegal," the manager responded, "that's how all warehouses work."  (ECF No. 40-7, Adams-Devonish Dep. Tr. 189:16–190:1.)  When asked at his deposition how he knew only Black employees failed to receive holiday pay, Plaintiff testified: "we all were complaining." *Id.* Tr. 190:2–4.  Plaintiff further testified that he spoke with three White employees, Greg, Stacey, and Cliff, who relayed to him that they had never experienced issues with their pay. *Id.* Tr. 191:22–192:13.  Beyond the three White employees with whom Plaintiff spoke, he could not say whether other White employees experienced problems with their pay. *Id.* Tr. 192:17–21.  Plaintiff also

confirmed that he does not have access to other employees' personnel files or payroll records. *Id.* Tr. 190:19–191:2.

### b. *April 2022 Town Hall Meeting*

On or about April 21, 2022,[2] Defendant held a town hall meeting to discuss its operations and revenue, with managers leading a presentation to an audience of warehouse employees and others who worked at the distribution center. (ECF No. 40-1 at p. 11; ECF No. 40-7, Adams-Devonish Dep. Tr. 161:12–16.) During the town hall meeting, the audience was asked whether there were any questions or concerns. Based on his view that Defendant wanted to cut back on overtime pay, Plaintiff asked whether employees could renegotiate the incentive structure base and employee compensation. (ECF No. 40-7, Adams-Devonish Dep. Tr. 144:13–20.) Senior Outbound Manager, Chuck Trill, a White male, responded to Plaintiff's request by stating that employees had already received an incentive on Halloween. (ECF No. 40-1 at p. 11; ECF No. 40-7, Adams-Devonish Dep. Tr. 145:6–8.) Plaintiff alleges that employees were only given "one Milky-way and one Snickers and [were told] happy [H]alloween." (ECF No. 40-7, Adams-Devonish Dep. Tr. 145:8–9.)

In response to Mr. Trill's comment, Plaintiff asked to speak again during the town hall meeting and provided the following analogy, which he recounted in his deposition:

> What's the only place that takes away time? They go "what?" I go "jail." You know why jail takes away time? So the inmates will conform and be docile and start asking when they going home. We only have one clock in the whole entire building and that's the punch-out clock at the front of the building. That's a contradiction of the notion we are part business owners. Let's take a step further. You are part business owners, but we don't know how much work is coming into the building; needless to say, the expected time we will be going home. If you ask me, we are only part business owners when it feeds your narrative.

---

[2] Plaintiff contends that the meeting occurred on or around April 10, 2022. (ECF No. 4 ¶ 12.)

(ECF No. 40-7, Adams-Devonish Dep. Tr. 145:12–146:4.)  After his comment, Plaintiff contends that his superiors were highly upset, perceived him as a threat, and that police officers were present outside the warehouse the following day when he reported to work.  *Id.* Tr. 146:5–22.  At deposition, Plaintiff testified:

> I don't think they were upset by the fact of what I was saying.  I think it was more so that the fact I was able to articulate myself in a manner where all walks of life understood.  Typically speaking, in warehouse industrial work a lot of the warehouse workers, specifically [B]lack males, are uneducated.  So you go in a warehouse, you hear a lot of cussing and fussing and things of that nature.  I don't conduct myself in that manner.  So that means I'm under the - - I can only perceive it as they looked at me as a threat.  Because that day I came to work, why was the police there?  Yet I come to work the next day after the whole soliloquy and the police is outside.  I paid them no attention.  They are sitting in their car.

*Id.* Tr. 146:5–22.

When Plaintiff arrived at work the day after the town hall meeting, Mr. Trill reiterated to the warehouse workers that they would not be receiving any additional incentives.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 147:8–14.)  Plaintiff contends that Mr. Trill then approached him and asked him whether he had anything to say and after Plaintiff said no, Mr. Trill told him, "Go the F to work."  *Id.* Tr. 146:5–22.  Mr. Trill eventually told Plaintiff that he did not like Plaintiff's attitude and stated, "[I]f you don't follow me to Human Resources, I'm going to call the police on you."  *Id.* Tr. 148:1–6.  Plaintiff avers that he and Mr. Trill went to speak with Human Resources manager, Irene Flores, where Mr. Trill continued to curse at Plaintiff and told Ms. Flores to write Plaintiff up and fire him.  *Id.* Tr. 151:21–152:3.  Plaintiff was not written up or fired over the incident but submitted a formal complaint through Defendant's Ethical Advocate hotline and Ms. Flores took statements from Plaintiff's coworkers.  *Id.* Tr. 152:4–12.

When asked during his deposition why he believed the interaction with Mr. Trill was racially motivated, Plaintiff responded:

> [A]ny time anybody threatens to call the police on anybody, but specifically [B]lack people, they get irate.  So I can only perceive it as, and I'm explaining this, you try to catch me with the okeydoke. You thought that once you threaten to call the police, it will cause me to get out of character, which will give the police a reason to come in the building.  Then I would have been walked off the job. Then I would have lost my job.

(ECF No. 40-7, Adams-Devonish Dep. Tr. 149:19–150:6.)  Additionally, when asked whether he viewed Ryan Bartels'[3] description of Plaintiff using the words "hostile, aggressive, and disruptive" to be racially motivated, Plaintiff responded, "I'm not drawing an inference.  Unfortunately, I can only tell you what my experience and that's my perception.  One man's perception is another man's reality.  By you trying to label me those negative names and I'm nothing of such, one can only perceive it as it being racial."  *Id.* Tr. 141:21–142:5.

### c.  *Additional Claims of Race Discrimination*

In addition to the incidents described above, Plaintiff testified about a third incident he alleges constitutes racial discrimination.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 180:9–18.) On an unspecified date, Plaintiff claims that the warehouse employees, all of whom were Black, were not working to management's satisfaction because the air conditioning in the warehouse was not working and employees were not provided water.  *Id.* Tr. 180:19–181:5.  Employees were told if they did not pick up their pace, they would be fired and replaced.  *Id.* Tr. 180:19–181:5.  Plaintiff also alleges Black and White employees were treated differently with respect to distribution of the books of customer orders, resulting in (presumably unfair) disparity.  *Id.* Tr. 182:6–183:11.

---

[3] Based on the record before the court, it appears undisputed that Bartels was Plaintiff's "first line supervisor" and "Operations Manager" at his workplace.  (ECF. No. 43-2 at p. 2; ECF No. 43-7 at p. 2.)  The court also infers Bartels is White.

#### d.  *Childcare Needs and Attendance Policy*

Next, Plaintiff alleges that Defendant discriminated against him on the basis of his race and gender because Defendant "allowed similarly situated female employee Megan Patrick to leave early to pick up her child while [he was] disciplined for the same." (ECF No. 4 ¶ 24). Plaintiff is a single father. (ECF No. 40-7, Adams-Devonish Dep. Tr. 188:13.)

Latice Gardner, a Black woman who served as Human Resources manager at the distribution center where Plaintiff worked, noticed a significant number of employees were not following Defendant's Attendance Policy. (Gardner Decl., ECF No. 40-2 ¶¶ 1, 7.) According to Gardner, these employees "were habitually leaving work before the end of their scheduled shifts for personal reasons, including childcare responsibilities." *Id.* Decl. ¶ 7. Ms. Gardner sought to put an end to this practice and identified eight employees who were habitually leaving early, including one Hispanic female, one White female, two Black females, two White males, and two Black males; Plaintiff was not among them.[4] (Gardner Decl., ECF No. 40-2 ¶¶ 8–9.) Accordingly, each employee was given a two-week grace period to make appropriate arrangements or switch to a different shift, and was warned that "leaving before the end of their assigned shift would not be tolerated." *Id.* Decl. ¶ 10. On August 24, 2022, Plaintiff sent an email to Ms. Gardner stating that he was "aware of the opportunity the company afforded selected people due to whatever accommodation they may need/seek" and he would be taking advantage of the opportunity to ensure that his son had reliable transportation to and from his extracurricular activities. *Id.* Decl. ¶ 11; *see* Email, ECF No. 40-3 at p. 9. Consequently, Plaintiff was excused from leaving work

---

[4] The White female identified by Ms. Gardner was Megan Patrick, the comparator named by Plaintiff in his Complaint. (ECF No. 4 ¶ 24; Gardner Decl., ECF No. 40-2 ¶ 9.) Ms. Patrick received written warnings from Defendant for violating the Attendance Policy on multiple occasions. (Gardner Decl., ECF No. 40-2 ¶ 15; ECF No. 40-6 at p. 2.; ECF No. 40-7, Adams-Devonish Dep. Tr. 207:4–9.)

early on August 25, 2022, August 29, 2022, and on September 1, 2022. *Id.* Decl. ¶ 14; *see* Timesheets, ECF 40-5 at pp. 16–17.

Prior to Plaintiff's excused absences, he received a corrective action form (a type of written warning) from Defendant on August 2, 2022, for leaving work early without prior authorization on three separate occasions in July 2022.[5]  (ECF No. 40-1 at. pp. 13–14; ECF No. 40-7, Adams-Devonish Dep. Tr. 213:4–21; Timesheets, ECF No. 40-5 at pp. 9–10.)  During his deposition, Plaintiff objected to the fact that the corrective action form said he left work early without authorization but acknowledged "if we are going by this company policy, I should have been fired a long time ago." (ECF No. 40-7, Adams-Devonish Dep. Tr. 213:17–18; 215:4–6.)  Plaintiff also stated that prior to receiving the corrective action form of August 2, 2022, he frequently left work early. *Id.* Tr. 215:22–216:4.

On September 12, 2022, Plaintiff received a second corrective action form, this time for unexcused absences from work on August 31, 2022, September 7, 2022, and September 9, 2022.[6] (ECF No. 40-1 at p. 14; ECF No. 40-7, Adams-Devonish Dep. Tr. 221:4–14.)  Plaintiff contends that his absence on September 9, 2022, was not unexcused.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 221:4–14.)  He claims that he mistakenly requested PTO for the wrong day, informed his manager of the error, received verbal approval to switch days, worked the originally requested PTO day, and was absent the following day pursuant to that approval. *Id.* Tr. 221:16–22. Plaintiff's timesheets do not show time off requested for September 8, 2022.  (Timesheets, ECF No. 40-5 at p. 18.)

---

[5] Defendant erroneously cites the August 2, 2022, Corrective Action Form as Exhibit 5 attached to the Motion.  Exhibit 5 consists only of Plaintiff's timesheets.  (ECF No. 40-4 at pp. 1–16; ECF No. 40-5 at pp. 1–22.)
[6] Defendant erroneously cites the September 12, 2022, Corrective Action Form as Exhibit 7 to the Motion.  Exhibit 7 consists of notes from Plaintiff's primary care physician.  (ECF No. 40-6 at pp. 3–7.)

### e. *Plaintiff's Allegations of Disability Discrimination*

Finally, Plaintiff claims that Defendant discriminated against him on the basis of disability when Defendant denied his "reasonable accommodation request for light duty while granting similarly situated [White] colleagues' requests for the same," and denied his request to park in parking spots designated for disabled individuals. (ECF No. 4 ¶ 10.) Plaintiff suffers from gastritis and ulcers; during "flare-ups" of these conditions, Plaintiff experiences side effects such as severe pain, vomiting, heartburn, nausea, sweating, muscle weakness, and stool incontinence. *Id.* ¶ 2; ECF No. 40-7, Adams-Devonish Dep. Tr. 135:3–20. Plaintiff testified at deposition that lifting heavy boxes (containing water bottle packages) would cause him to throw up "profusely." (ECF No. 40-7, Adams-Devonish Dep. Tr. 245:5–14.) He then clarified, "I'm physically fit, but I'm not big whatsoever. But yet you want me to keep up with the rate at 120 items per hour." *Id.* Tr. 245:15–18. Based on his conditions, Plaintiff sought accommodation in the form of light duty and a parking spot close to the warehouse. (ECF No. 40-7, Adams-Devonish Dep. Tr. 257:11–258:15; Physician's Note, ECF No. 40-6 at p. 4.)

With respect to parking, Plaintiff avers that it was necessary to have "front row" parking to shorten the distance he had to walk from his car to the warehouse in the event of a flare-up; Plaintiff illustrated the point by describing an occasion when Human Resources manager, Irene Flores, observed that he had soiled himself due to a flare-up. (ECF No. 40-7, Adams-Devonish Dep. Tr. 251:7–20.) The North East, Maryland distribution center has 20 parking spaces reserved for visitors and a separate area for tractor trailers to park, load, and unload at the front of the building. (Summerville Decl., ECF No. 40-8 ¶ 8.) "There is a separate parking area for employees immediately adjacent to the visitor parking lot." *Id.* Defendant contends that keeping the parking

area at the front of the building free of employee vehicles is essential for safety and maintaining business operations. *Id.*

After Ms. Flores witnessed the effects of Plaintiff's flare-up (stool incontinence), Plaintiff was approved to park at the front of the building. (ECF No. 40-7, Adams-Devonish Dep. Tr. 251:7–10.) Then, during the Spring of 2022, Everett Summerville (a Black male), Senior Director of the North East distribution center, became aware that many employees, including Plaintiff, were parking in the visitor parking spaces at the front of the building. (Summerville Decl., ECF No. 40-8 ¶ 9.) Mr. Summerville instructed all employees that they were no longer permitted to park in the visitor parking spaces unless it was needed "as an accommodation for a medical condition." *Id.* Plaintiff informed Mr. Summerville that he needed to park in front of the building due to his medical condition. *Id.* Mr. Summerville allowed Plaintiff to continue to park in front of the building until he obtained a doctor's note. *Id.* After several months, however, Plaintiff failed to provide the necessary documentation and was informed that he could no longer park in front of the building, and was required to use the employee parking lot. *Id.*

On or about June 22, 2022, Plaintiff provided medical documents to his manager, Andrew Crossan. (ECF No. 40-1 at pp. 15–16; ECF No. 40-7, Adams-Devonish Dep. Tr. 257:17–258:3.) The documents included a clinical summary from a June 21, 2022, doctor visit and a note from Dr. Mark Lohkamp of CCHS Primary Care at Elkton, which stated, "Please allow Mr. Adams-Devonish to participate in light duty at work and give him accommodations for parking. He was seen today on 6/21/2022 and is under our case. Feel free to call our office with any questions." (Physician's Note and Clinical Summary, ECF No. 40-6 at pp. 4–7.)

The following day, June 23, 2022, Plaintiff submitted an additional report through Defendant's Ethical Advocate hotline recounting a meeting with Mr. Summerville and HR

12

manager Latice Gardner to discuss his request for accommodation.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 270:3–18.)  The report stated, "During this meeting Latice made me fill out a form she made.  It is not a company document on the form.  It's being requested that I give consent for [] my medical information from my doctor which is against my HIPAA rights." *Id.* Tr. 270:18–271:1; Ethical Advocate Report, ECF No. 40-7 at pp. 93–94.  During the meeting, Ms. Gardner informed Plaintiff that the doctor's note he provided was too vague; she explained that Defendant required additional information as to his restrictions and requested accommodation, and provided Plaintiff with Defendant's Accommodation Request Assessment Form for his doctor to complete.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 258:4–9, 269:1–16; Gardner Decl., ECF No. 40-2 ¶ 20; Accommodation Request Assessment Form, ECF No. 40-6 at pp. 9–11.)  Plaintiff informed Ms. Gardner that he would have his attorney look over the form.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 272:7–11.)

On July 7, 2022, as an interim accommodation, Defendant transferred Plaintiff to A-Zone, where his duties included putting together cardboard boxes and did not require lifting heavy items.  (ECF No. 40-1 at p. 11; ECF No. 40-7, Adams-Devonish Dep. Tr. 274:4–9; Gardner Decl., ECF No. 40-2 ¶ 23.)  After one week in this new position, Plaintiff asked to be transferred back to his prior position as a Selector on the warehouse floor, which Defendant granted.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 264:7–21; Gardner Decl., ECF No. 40-2 ¶ 24.)  Plaintiff testified that he perceived his new assignment as a form of retaliation and discrimination because he was "isolated" and working with pregnant women.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 264:11–265:8.)

On September 1, 2022, Plaintiff returned the completed Accommodation Request Assessment Form to Ms. Gardner.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 272:12–273:12;

Gardner Decl., ECF No. 40-2 ¶ 22; Completed Accommodation Request Assessment Form, ECF No. 40-7 at pp. 97–99.)  On the form, Plaintiff's doctor indicated that Plaintiff was unable to perform the essential functions of his position with or without reasonable accommodation, and that Plaintiff required four weeks of continuous/regular leave as an accommodation to allow for follow up with a specialist.  (Completed Accommodation Request Assessment Form, ECF No. 40-7 at pp. 97–99.)  Plaintiff's doctor also wrote "none" on the form in response to the question: "What adjustments to the work environment or position responsibilities would enable the employee to perform the essential functions of their position." *Id.*  On September 13, 2022, a representative for Defendant called Plaintiff and informed him that his medical leave would be approved.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 276:4–17.)  Plaintiff responded that he was not making a request for leave, rather he sought reasonable accommodation while at work.[7] *Id.* Tr. 276:17–20.

### D.  Plaintiff's Termination

On September 14, 2022, Plaintiff left work early due to a "medical episode."  (ECF No. 40-7, Adams-Devonish Dep. Tr. 283:3–5.)  Plaintiff sought out his direct supervisor, Larry Fox, to inform him he was leaving, but was unable to find him.  *Id.* Tr. 285:4–8.  Despite seeing other members of management as he was leaving, Plaintiff only informed his team lead, Chevy Hamilton, that he was leaving early. *Id.* Tr. 284:16–285:3.  After leaving, Plaintiff texted Mr. Fox informing him that he had left the building and "felt nausea coming."  (Text Message, ECF No. 40-7 at p. 102.)  Plaintiff testified that he was aware of the warehouse operations policy, but that he did not know the policy stated it was not acceptable to call a fellow employee, including a lead, HR, or warehouse admin who is not a member of management when leaving early.  (ECF No. 40-

---

[7] The court observes that a leave of absence can be a reasonable ADA accommodation and understands Plaintiff to state that he was not seeking leave as an accommodation.

7, Adams-Devonish Dep. Tr. 285:9–286:4.)  Plaintiff claims he was following the chain of command.  *Id.* Tr. 284:16–285:3.

On the same day, another warehouse employee provided a statement to management stating that Plaintiff announced loudly to everyone that he was done for the day and "not doing anything else."  (Summerville Decl., ECF No. 40-8 ¶ 16; Chenoweth Statement, ECF No. 40-7 at p. 101.) She described the situation as "tense" and "very uncomfortable."  (Chenoweth Statement, ECF No. 40-7 at p. 101.)  Plaintiff was ultimately terminated on September 15, 2022, the day after he left early without approval from a direct supervisor or management.  (September 15, 2022, Corrective Action Form, ECF No. 40-7 at p. 100.)  The final Corrective Action Form provides that Plaintiff's employment was terminated for "repeatedly walking off the job without prior approval from a supervisor or manager, failure to complete assigned workloads, and refusing to follow direction from a supervisor and/or manager as well as continued refusal to follow direction after it was explained again[.]"  *Id.*

Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on September 7, 2022, and received a notice of his right to sue on January 24, 2024.  (EEOC Notice of Charge, ECF No. 40-10 at pp. 2–5; EEOC Notice of Right to Sue, ECF No. 4-1 at pp. 1–2.)  This action followed.

## III.   LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Libertarian Party of Va. v. Judd*, 718 F.3d 308,

313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive").

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

16

IV.    **ANALYSIS**

As an initial matter, the court is ever mindful that *pro se* filings "must be construed liberally, . . . so as to do substantial justice," and are held to less stringent standards than filings drafted by lawyers. *Elijah v. Dunbar*, 66 F.4th 454, 460 (4th Cir. 2023) (quoting *Erickson v. Paradus*, 551 U.S. 89, 94 (2007); FED. R. CIV. P. 8(f); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "In practice, this liberal construction allows courts to recognize claims despite various formal deficiencies, such as incorrect labels or lack of cited legal authority." *Wall v. Rasnick*, 42 F.4th 214, 218 (4th Cir. 2022). Such liberal construction, however, does not absolve Plaintiff from pleading a plausible claim, and this court "may not act as an advocate for a self-represented litigant" by "conjur[ing] up" issues not presented. *Desgraviers v. PF-Frederick, LLC*, 501 F. Supp. 3d 348, 351 (D. Md. 2020) (quoting *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 314 (D. Md. 2014), *aff'd*, 584 F. App'x 135 (4th Cir. 2014); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Defendant asserts three arguments in its Motion as to why it is entitled to summary judgment on all claims: (1) Defendant accommodated Plaintiff's disability; (2) Plaintiff fails to establish a *prima facie* case of race and gender discrimination under Title VII; and (3) Plaintiff fails to present any evidence to rebut Defendant's evidence of the "legitimate, non-retaliatory reasons for its actions." (ECF No. 40-1 at pp. 15–27.)

**A. Federal Rule of Civil Procedure 56**

As an initial matter, the court's analysis begins with the requirements of Federal Rule of Civil Procedure Rule 56. Defendant asserts that the majority of the exhibits attached to Plaintiff's response to the Motion—with the exception of the Amended Verified Complaint submitted by Plaintiff to the EEOC (ECF No. 43-5 at pp. 61–67)—cannot not be considered by the court on a

17

motion for summary judgment because they are made up of documents, emails, and statements that are unauthenticated and not signed under penalty of perjury; Defendant urges further that Plaintiff merely "rests on generalized statements that he has stated a claim." (ECF No. 50 at pp. 3–4.) In his surreply, Plaintiff argues that the exhibits attached to his opposition are admissible pursuant to Rule 56(c) because "[p]ro se litigants are not required to adhere to formal evidentiary protocols at the summary judgment stage so long as the evidence is based on personal knowledge and would be admissible at trial." (ECF No. 52-1 at p. 1.)

Pursuant to Rule 56(c)(1), the party "asserting that a fact cannot be or is genuinely disputed must support this assertion." FED. R. CIV. PROC. 56(c)(1). This makes sense inasmuch as the court may not engage in fact finding or evidence weighing on a Rule 56 motion. The rule prescribes two methods by which a party can satisfy its 56(c)(1) burden:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1)(A)-(B).

Plaintiff attaches to his opposition to the Motion over 100 pages of exhibits labeled D through H. (ECF No. 43-1–43-6.) The exhibits are comprised of a personal timeline of events (including illegible screenshots) created by Plaintiff, copies of emails, correspondence and documents related to Plaintiff's EEOC charge, unverified character/witness statements, and medical documents. Because Plaintiff's Complaint and Amended Verified Complaint submitted to the EEOC are verified, the factual assertions contained therein may be considered in opposition

18

to the Motion. *See Williams v. Griffin*, 952 F.2d 820 (4th Cir. 1991) (holding that "a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge") (citing *Davis v. Zahradnick*, 600 F.2d 458, 459–60 (4th Cir.1979)).

"Depositions and affidavits must be based on personal knowledge, and all documents and other physical evidence must be properly authenticated and either non-hearsay or within a recognized exception." *E.E.O.C. v. Denny's, Inc.*, Civ. No. WDQ-06-2527, 2010 WL 2817109, at *3 (D. Md. July 16, 2010). "For a court to accurately determine whether there is a factual dispute for a jury, the judge must be assured that the evidence [s]he examines at summary judgment is as authentic as that which the jury will consider." *Tillery v. Borden*, No. CIV.A. CBD-07-1092, 2010 WL 2132226, at *2 (D. Md. May 25, 2010). With the exception of the verified Complaint and Amended Complaint, the remainder of Plaintiff's exhibits are not authenticated. The court, therefore, will not consider the additional exhibits submitted by Plaintiff.

Notwithstanding the unauthenticated exhibits, Plaintiff's opposition is deficient because it does not comply with the express instructions of Rule 56(c). To the extent Plaintiff "assert[s] that a fact . . . is genuinely disputed," he must do so "by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1). Alternatively, Plaintiff may "object that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). Plaintiff's opposition fails to cite any particular parts of the record. (ECF No. 43 at pp. 1–4.) To the extent Plaintiff attempts to dispute Defendant's asserted facts absent reference to admissible materials in the record, he fails to demonstrate a genuine dispute of fact and the court will consider those facts to be undisputed. *See* FED. R. CIV. P. 56(e)(2) ("If a party

19

fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion.")

### B. Defendant's Motion

#### 1. ADA Claim

"Congress enacted the Americans with Disabilities Act in 1990 to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *A Helping Hand, LLC v. Baltimore County,* 515 F.3d 356, 361 (4th Cir. 2008) (citation omitted). "The Act prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111–12117; public services, under Title II, 42 U.S.C. §§ 12131–12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182–12189." *Id.* Relevant here, Title I of the ADA prohibits employment discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Discrimination under the ADA includes an employer's failure to make "reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 12112(b)(5)(A). A "qualified individual" is an employee "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "[I]n order for a plaintiff to establish a *prima facie* case against his employer for failure to accommodate under the ADA, the

plaintiff must show: '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodation.'" *Wirtes v. City of Newport News*, 996 F.3d 234, 238–39 (4th Cir. 2021) (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)).

Plaintiff contends that Defendant's denial of his reasonable accommodation requests for light duty and parking privileges constitutes unlawful disability discrimination under the ADA. (ECF No. 4 ¶ 10.)  Defendant does not argue that Plaintiff did not have a disability or that it did not receive notice of his disability; rather, Defendant argues that it is entitled to summary judgment on Plaintiff's ADA claim because Plaintiff "has not offered sufficient evidence that with his requested parking accommodation he could perform the essential function of the position or that KeHE refused to make a reasonable accommodation."  (ECF No. 40-1 at p. 20.)

"The plaintiff bears the burden of identifying an accommodation that would allow a qualified individual to perform the job, as well as the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 481 (4th Cir. 2010); *see US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002) (finding "that a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an 'accommodation' seems reasonable on its face").  "A reasonable accommodation is one that is feasible or plausible." *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 414 (4th Cir. 2015).[8]  The ADA includes a non-exhaustive list of accommodation examples, such as: "job restructuring, part-time or modified work schedules, reassignment to a vacant

---

[8] A "reasonable accommodation" includes a "[m]odification[ ] or adjustment[ ] to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position[.]"  29 C.F.R. § 1630.2(o)(1)(ii).

21

position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, [or] other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). "Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is 'reasonable on its face, *i.e.,* ordinarily or in the run of cases.'" *Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 464 (4th Cir. 2012) (quoting *Barnett*, 535 U.S. at 401–402).

Defendant argues that with respect to Plaintiff's request to park in front of the warehouse, Plaintiff "has not offered evidence indicating that a parking accommodation would enable him to perform the essential functions of his position." (ECF No. 40-1 at p. 20.) Without addressing Defendant's argument directly, Plaintiff's opposition merely states that there are material facts in dispute as to his claim of disability discrimination because he "provided medical documentation for ADA accommodations." (ECF No. 43 at p. 2.) As previously held by this court:

> Not every job-related request by a disabled employee that is denied by her employer will subject the employer to liability for failure to provide a reasonable accommodation. Rather, the denial of a request by a disabled employee could only subject the employer to liability if there is "a causal relationship between the disability and the request for accommodation," or, in other words, if "the requested accommodation was *necessary* in order for [her] to perform the essential functions of [her] job." *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir.1997) (emphasis added).

*Fierce v. Burwell*, 101 F. Supp. 3d 543, 550 (D. Md. 2015).

In *Fierce*, the plaintiff requested to telework one day a week as a reasonable accommodation of her disability, depression. *Id.* The court granted summary judgment for the defendant and held that the plaintiff's reasonable accommodation claim failed because she

22

provided "no evidence that her disability *required* her to work from home[]" and it was obvious that she did not need to telework because she continued to work after her request was denied. *Id.* (emphasis in original).

Similarly, here, Plaintiff has provided no evidence as to how his gastritis and ulcers—and the flare-ups caused by his symptoms—required him to park in front of the warehouse every day. During his deposition, Plaintiff testified that he had been allowed to park in front of the building from the date that he began working for Defendant until April 2022 when Everett Summerville, Senior Director of the distribution center, informed him he could no longer park there. (ECF No. 40-7, Adams-Devonish Dep. Tr. 253:5–22; Summerville Decl., ECF No. 40-8 ¶ 9.) Although Plaintiff calls this an accommodation, both he and Defendant agree that he did not provide any medical documents or formal accommodation request for parking until after he was told not to park in front of the building. (ECF No. 40-7, Adams-Devonish Dep. Tr. 253:20–254:9; Summerville Decl., ECF No. 40-8 ¶ 9.)

Further, there is no evidence in the record before the court suggesting that Plaintiff continued to park in front of the building after April 2022 until his termination in September 2022. As in *Fierce*, it is obvious that Plaintiff did not need to park in front of the building to perform the essential functions of his job, as demonstrated by the fact that he continued working for Defendant for approximately five months after he was no longer permitted to park there. While the requested parking accommodation may have been ideal given Plaintiff's medical condition, it was not necessary to enable him to perform the essential functions of his job. *See Fierce*, 101 F. Supp. 3d at 550 (noting that while the plaintiff's requested accommodation would have been ideal in light of her condition, there was no evidence that she needed the accommodation to allow her to perform the essential functions of her job).

With respect to Plaintiff's request for "light duty" accommodation, Defendant contends that Plaintiff cannot satisfy the fourth element to establish a *prima facie* case for failure to accommodate: that the employer refused to make such accommodation.  Defendant argues that it "did, in fact, offer [Plaintiff] multiple accommodations for his disability despite his reluctance to engage in the interactive process, and all of which he rejected," including assignment to light duty in the A-Zone.  (ECF No. 40-1 at p. 21; *see supra,* ECF No. 40-7, Adams-Devonish Dep. Tr. 264:11–265:8, 274:4–9; Gardner Decl., ECF No. 40-2 ¶ 23.)  Plaintiff responds that Defendant "failed to engage meaningfully in the interactive process, delayed responding to Plaintiff's requests, and ultimately offered leave which Plaintiff's physician did not indicate was required." (ECF No. 43 at p. 2.)

"The employee bears the burden of identifying an accommodation that allows [him] to perform [his] position." *Wedderburn v. Bd. of Educ. of Baltimore Cnty.*, No. 8:19-CV-00215-PX, 2022 WL 504511, at *9 (D. Md. Feb. 18, 2022).  "A vague and inscrutable request simply cannot be considered reasonable." *Id.*  Additionally, "[a]n employer is not obligated to provide a qualified individual with the accommodation of the employee's choice upon demand; the employer must only provide a reasonable accommodation." *Dahlman v. Tenenbaum*, No. CIV.A. DKC 10-2993, 2011 WL 3511062, at *13 (D. Md. Aug. 9, 2011).  "The provided accommodation must be effective—that is, address the disability-related limitations identified by the employee as an inhibitor to performing the essential functions of her job." *Wedderburn*, 2022 WL 504511 at *10.

Here, Plaintiff has provided no evidence as to what his "light duty" accommodation request entails and his initial request was impermissibly vague.  Moreover, the undisputed record is that Defendant did not refuse to make such accommodation. As set forth above, the undisputed facts are that Plaintiff submitted his first accommodation request on June 22, 2022, which generally

24

requested that Plaintiff be allowed to participate in light duty at work with no additional information. (ECF No. 40-7, Adams-Devonish Dep. Tr. 257:17–258:3.) Plaintiff was informed that the doctor's note he provided was too vague and that Defendant required additional information as to his restrictions and requested accommodation, including having his doctor complete an Accommodation Request Assessment Form. (ECF No. 40-7, Adams-Devonish Dep. Tr. 258:4–9, 269:1–16; Gardner Decl., ECF No. 40-2 ¶ 20.) In the interim, Defendant assigned Plaintiff to a new position in A-Zone where his duties included putting together cardboard boxes and did not require lifting heavy items, which he claims induced his flare ups. (ECF No. 40-7, Adams-Devonish Dep. Tr. 274:4–9; Gardner Decl., ECF No. 40-2 ¶ 23.) The undisputed record is that Plaintiff rejected that accommodation by asking to be transferred back to his position as a Selector because he felt isolated and was primarily working with pregnant women, which he apparently found unacceptable. *Id.* Tr. 264:11–265:8.

It is further undisputed that Plaintiff failed to return the completed Accommodation Request Assessment Form until months later, in September 2022. (Completed Accommodation Request Assessment Form, ECF No. 40-7 at pp. 97–99.) Importantly, the form indicated both that Plaintiff was unable to perform the essential functions of his position with or without reasonable accommodation, and that Plaintiff required four weeks of continuous/regular leave as an accommodation to allow for follow up with a specialist. Even though Plaintiff's doctor advised that no accommodation would render Plaintiff competent to do the job, Defendant nonetheless approved leave as an accommodation, but Plaintiff rejected it. *Id.* Plaintiff asserts that his doctor did not indicate that leave was required, but his own testimony undermines that assertion, and confirms that the form he provided requested four weeks of continuous leave as an accommodation (despite the fact that the doctor noted that no accommodation would render Plaintiff able to

perform the essential functions of his job).  Further, the form itself confirms the doctor's recommendation.

The undisputed record on this point is unambiguous.  The only record is that Defendant did not refuse to provide accommodation for Plaintiff.  Quite to the contrary, the undisputed record facts are that Defendant made precisely the accommodation Plaintiff requested (light duty) and, when Plaintiff rejected that, Defendant agreed to the accommodation recommended by Plaintiff's physician (leave), which Plaintiff also rejected.  Nothing on the completed Accommodation Request Assessment Form suggests preferred parking as an accommodation (and, rather confusingly, the form confirms no accommodation would render Plaintiff able to complete the essential functions of the job).  (ECF No. 40-7 at pp. 97–99.)  The court agrees with Defendant that Plaintiff's reluctance to provide Defendant with sufficient medical information, as well as Plaintiff's significant delay in providing the necessary forms, made it "impossible for [Defendant] to effectively assess what accommodations other than the ones it offered him might have been appropriate."  (ECF No. 40-1 at p. 23.)  Even so, Defendant made every effort to attempt to accommodate Plaintiff.  Accordingly, Plaintiff fails to establish a *prima facie* case against his employer for failure to accommodate under the ADA.  Defendant is entitled to summary judgment on Plaintiff's ADA claim.

### 2. Title VII Claims

"Title VII forbids (i) employment practices that discriminate against an employee on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2, and (ii) retaliation against an employee for opposing adverse actions that she reasonably suspects to be unlawful under Title VII, 42 U.S.C. § 2000e-3." *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018).  "A plaintiff pursuing a claim under Title VII may either offer direct evidence of discrimination or,

using indirect evidence, []he may rely on the burden shifting framework that was adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)." *Coleman v. Whitley*, No. 21-1181, 2022 WL 16630570, at *2 (4th Cir. Nov. 2, 2022). "To satisfy ordinary principles of proof, [a plaintiff] must provide direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact." *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 959 (4th Cir. 1996). "Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Cole v. Fam. Dollar Stores of Md., Inc.*, 811 F. App'x 168, 175 (4th Cir. 2020) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999)).

Absent direct evidence, as is the case here, a plaintiff must establish a *prima facie* case pursuant to the *McDonnell Douglas* standard. *McDonnell Douglas Corp.*, 411 U.S. at 802. Under the *McDonnell Douglas* standard, the plaintiff bears the initial burden of establishing by a preponderance of evidence a *prima facie* case of discrimination. *Texas Dep't of Cnty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* at 254. "To establish a 'presumption' is to say that a finding of the predicate fact (here, the prima facie case) produces 'a required conclusion in the absence of explanation' (here, the finding of unlawful discrimination)." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citations omitted).

"To establish a claim of disparate treatment under Title VII, a plaintiff must put forth a *prima facie* case of discrimination alleging that: '(1) [he] is a member of a protected class; (2) [he] 'suffered an adverse employment action'; (3) [his] job performance was satisfactory; and (4) the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful

discrimination.'" *Iwebo v. Sheppard Pratt Health Sys., Inc.*, No. CV BPG-19-3008, 2020 WL 4748579, at *5 (D. Md. Aug. 14, 2020) (quoting *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017), as amended (Aug. 11, 2017)). "The fourth element is met if 'similarly-situated employees outside the protected class received more favorable treatment.'" *Id.* (quoting *Swaso*, 698 F. App'x at 747). If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for [the employment action]." *McDonnell Douglas Corp.*, 411 U.S. at 802. "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507 (quoting *Burdine*, 450 U.S. at 254–55). "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (citations omitted). "[A]lthough the *McDonnell Douglas* presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Hicks*, 509 U.S. at 507 (quoting *Burdine*, 450 U.S. at 253).

"An employer is entitled to summary judgment if the plaintiff fails to establish a *prima facie* case of discrimination or fails to raise a factual dispute regarding the employer's proffered reasons for the alleged discriminatory act." *Henson v. Liggett Group, Inc.,* 61 F.3d 270, 274 (4th Cir. 1995). Further, "the mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 943 (4th Cir. 1992)).

Here, there is no dispute that Plaintiff is a member of a protected class. Instead, Defendant challenges the remaining elements: that Plaintiff was subject to adverse employment action, that his job performance was satisfactory, and that adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. (ECF No. 40-1 at pp. 25–29.) *See Coleman*, 626 F.3d at 190, *supra*.

a.    Adverse Employment Action

First, Defendant argues that Plaintiff "has not proffered sufficient evidence that he suffered adverse employment actions related to his race or gender." (ECF No. 40-1 at p. 25.) Defendant cites the relevant portions of Plaintiff's deposition testimony concerning the alleged adverse actions related to Plaintiff's race and gender.

> Adams-Devonish alleges that he experienced disparate treatment based on his race when Chuck Trill threatened to call the police on him following a town hall meeting and when his holiday pay for New Years Day in 2022 was delayed. (Adams-Devonish Dep., 179:13–22; 180:1–13; 189:1–22). He also alleges that KeHE generally treated White workers more favorably when administering work assignments and on one occasion threatened to fire all warehouse workers the majority of whom happened to be Black. (*Id.*) Adams-Devonish alleges that he experienced gender discrimination because women were allowed to leave their shifts early for their childcare needs, but he received written warnings for the same conduct.

*Id.* In his opposition, Plaintiff generally claims that "unwarranted discipline and termination" constitute adverse employment actions. (ECF No. 43 at p. 1.) He also asserts threatening to call police on a Black employee "is an intimidation tactic sufficient to constitute a materially adverse action." *Id.* at p. 2.

29

An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)).  As noted by Defendant, a mere threat that does not cause a significant change in employment status is not an adverse employment action.  *See Brooks v. United Parcel Service Inc.*, No. CV DKC 20-2617, 2021 WL 4339194, at *12 (D. Md. Sept. 23, 2021) (citing *Bell v. McDonald*, 14-cv-0188, 2016 WL 7441674, at *10 (M.D.N.C. Dec. 27, 2016) (finding that "merely threatening a demotion is not an adverse employment action in an employment discrimination claim.")).  Accordingly, Chuck Trill's threat to call police on Plaintiff after Defendant's Town Hall meeting and Defendant's threat to fire warehouse workers (all of whom were Black) did not constitute adverse employment actions because there is no evidence that those incidents caused a change in Plaintiff's employment status or benefits.

As to the delay in Plaintiff's holiday pay, "a mere delay in receiving [his] benefits does not constitute an adverse employment action[.]" *Suteerachanon v. McDonald's Restaurants of Maryland, Inc.*, No. CIV.A. RWT-13-2889, 2014 WL 6674587 (D. Md. Nov. 24, 2014), *aff'd*, 607 F. App'x 339 (4th Cir. 2015).  Plaintiff testified at deposition that the discrepancy in his holiday pay was rectified within three weeks.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 188:1–5.) Further, allegation that a work assignment amounts to an adverse action because it is more stressful or difficult is inadequate to survive summary judgment.  *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 491–492 (D. Md. 2013), *aff'd sub nom. In re Canarte*, 558 F. App'x 327 (4th Cir. 2014).  Therefore, Plaintiff's allegation that White employees received more favorable and "easier" books

30

of customer orders than Black employees does not, on its own, constitute adverse employment action.  (ECF No. 40-7, Adams-Devonish Dep. Tr. 162:5–21.)

Finally, Defendant argues that the two written warnings Plaintiff received for unexcused absences and leaving work early without proper authorization do not constitute adverse employment actions because "[w]ritten warnings alone are not sufficiently adverse to make out a discrimination claim."  *Bell v. Univ. of Maryland Coll. Park Campus Facilities Mgmt.*, No. CV PX-17-1655, 2018 WL 3008325, at *7 (D. Md. June 14, 2018).  Here, the court disagrees.  Defendant asserts that "there is no dispute that [Plaintiff] left work early on multiple occasions, and specifically on the occasions memorialized in the two Written Warnings that he received and on September 15, 2022, which led to his termination."  (ECF No. 40-1 at p. 27.)  Thus, the two written warnings ultimately led to Plaintiff's termination, a significant change in his employment status.  Accordingly, the court finds that the two written warnings constitute an adverse employment action, thereby satisfying the second element of Plaintiff's *prima facie* claim of discrimination.

### b.   Satisfactory Job Performance

Next, Defendant argues that Plaintiff fails to establish a *prima facie* case of discrimination because he "was not performing his job at a satisfactory level."  (ECF No. 40-1 at pp. 26–27.)  In analyzing satisfactory job performance, it is the "perception of the decision maker which is relevant, not the self-assessment of the plaintiff."  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).  The plaintiff is not required "to show that he was a perfect or model employee."  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019).  "Rather, a plaintiff must show only that he was qualified for the job and that he was meeting his employer's legitimate expectations."  *Id.*

31

Plaintiff fails to address Defendant's argument as to whether he met Defendant's legitimate expectations, and thus concedes the point.  Nonetheless, there is no dispute that Plaintiff received two written warnings prior to his termination for unexcused absences and leaving work early without proper authorization per Defendant's Attendance Policy.  In fact, Plaintiff testified deposition: "if we are going by this company policy, I should have been fired a long time ago." (ECF No. 40-7, Adams-Devonish Dep. Tr. 215:4–6.)  As Plaintiff was not meeting Defendant's legitimate expectations at the time the written warnings were issued or when he was terminated, Plaintiff fails to establish a *prima facie* case of discrimination.

### c.   Inference of Race or Gender Discrimination

Finally, Defendant contends that none of the conduct identified by Plaintiff "as forming the basis of his race or gender claims occurred under circumstances that give rise to an inference of discrimination."  (ECF No. 40-1 at p. 27.)  In opposition, Plaintiff notes that while Defendant claims Plaintiff was terminated for failing to abide the Attendance Policy, other employees "engaged in similar conduct without termination."  (ECF No. 43 at p. 2.)

As set forth above, a plaintiff can demonstrate adverse employment action under circumstances giving rise to an inference of unlawful discrimination if "similarly-situated employees outside the protected class received more favorable treatment." *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017), as amended (Aug. 11, 2017).  "[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (quoting *Haywood v. Locke*, 387 F. App'x. 355, 359 (4th Cir. 2010)).

As set forth above, only the two written warnings issued to Plaintiff for violating Defendant's Attendance Policy constituted adverse employment action.  Plaintiff identifies comparator Megan Patrick, a White female employee, who Defendant allowed to leave work early to pick up her child while Plaintiff was disciplined for the same action.  (ECF No. 4 ¶ 24.)  It is undisputed that Human Resources manager, Latice Gardner, identified several employees who were habitually leaving early, including one Hispanic female, one White female, two Black females, two White males, and two Black males, and that each employee was given a two-week grace period to make appropriate arrangements or switch to a different shift, and was warned that "leaving before the end of their assigned shift would not be tolerated."  (Gardner Decl., ECF No. 40-2 ¶¶ 8–10.)  Megan Patrick was one of these employees.

According to the undisputed record, on August 24, 2022, Plaintiff emailed Ms. Gardner seeking to take advantage of the same opportunity to ensure that his son had reliable transportation to and from his extracurricular activities.  (Email, ECF No. 40-3 at p. 9.)  As a result, Plaintiff was excused to leave work early on three occasions over the following two weeks.  Additionally, contrary to the allegation in Plaintiff's Complaint, the record is that Megan Patrick also received written warning for violation of the Attendance Policy on multiple occasions.  (ECF No. 40-6 at p. 2.)  Accordingly, Plaintiff fails to generate a triable issue as to whether Defendant imposed (or Plaintiff sustained) adverse employment action under circumstances giving rise to an inference of unlawful discrimination.

To the extent Plaintiff alleges he was discriminated against based on his race or gender, he fails to state a *prima facie* case as to either.  There is no genuine dispute of material fact on the

above-discussed elements, and Defendant is entitled to judgment as a matter of law on Plaintiff's Title VII claim(s) of race and gender discrimination.

### 3. *Retaliation Claim*

Finally, Defendant argues it is entitled to summary judgment on Plaintiff's retaliation claim under Title VII and the ADA because Plaintiff fails to provide "any evidence that he experienced a materially adverse employment action except for his termination, nor has he provided any affirmative evidence of a link between any protected activity and his termination." (ECF No. 40-1 at p. 30.) Defendant also urges that Plaintiff offers no evidence to rebut Defendant's legitimate, non-retaliatory reasons for its actions. *Id*.

The ADA anti-retaliation provision provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203. Similarly, Title VII makes it unlawful for an employer to discriminate against any employee because he "has made a charge, testified, assisted, or participated in any manner" in a Title VII enforcement proceeding. 42 U.S.C. § 2000e-3(a). This provision's "purpose is to protect employees who complain about real or perceived discrimination in the workplace from retaliation, which threatens to chill the willingness of employees to speak up." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022).

Courts typically apply the standards applicable to Title VII retaliation claims to ADA retaliation claims. *See, e.g., Laird v. Fairfax Cty.*, 978 F.3d 887, 893 n.5 (4th Cir. 2020) (noting that "[a]lthough [the plaintiff's] case involves claims under the ADA, we treat the Title VII context as being 'analogous' to the ADA for this purpose"); *Wilson v. Montgomery Cnty. Coll. Bd. of Trs.*,

No. 17-CV-2784-PWG, 2021 WL 1102341, at *4 (D. Md. Mar. 23, 2021) (finding that "an ADA retaliation action . . . is assessed through the same lens as a Title VII retaliation claim").

As with discrimination claims, a plaintiff "may prove that an employer took action with . . . retaliatory intent through direct evidence or through the burden-shifting framework of *McDonnell Douglas." Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 327 (4th Cir. 2018). Pursuant to the *McDonnell Douglas* three-step framework, a plaintiff must first establish a *prima facie* case of retaliation. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). To establish a *prima facie* case of retaliation, a plaintiff "must show: '(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action.'" *Barbour v. Garland*, 105 F.4th 579, 589–90 (4th Cir. 2024) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)). After a *prima facie* showing, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250 (citation omitted). If such showing is made, the burden then "shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.* (citation omitted).

Plaintiff suggests that the written warnings he received, and his subsequent termination, was retaliation for several protected activities, including: (1) his complaints of racial discrimination, (2) his disability accommodation requests under the ADA, and (3) filing his EEOC charge on September 7, 2022.[9] (ECF No. 43 at p. 2.) *See Haulbrook v. Michelin North Am.,* 252

---

[9] Defendant offers that at deposition, Plaintiff "clarified that his theory of his retaliation claim is that he was subjected to written warnings regarding attendance in retaliation for seeking a reasonable accommodation[] for his disability and that he was terminated in retaliation for filing his formal Complaint with the EEOC." (ECF No. 40-1.) The court notes that the cited portions of Plaintiff's deposition testimony do not appear in the deposition excerpts provided by Defendant at ECF No. 40-7. Therefore, the court does not consider this.

F.3d 696, 706 (4th Cir. 2001) (holding that a request for reasonable accommodation constitutes "protected activity"); *Williams v. Silver Psychotherapy, LLC*, No. CV DKC 24-476, 2025 WL 1504829, at *6 (D. Md. May 27, 2025) (holding plaintiff engaged in protected activity by complaining internally and filing a charge of discrimination with the EEOC).  Defendant does not dispute that Plaintiff engaged in protected activities.

First, Defendant argues that the written warnings for Plaintiff's violations of the Attendance Policy cannot serve as independent adverse action for purposes of his retaliation claim. *See Montgomery v. Medstar Montgomery Med. Ctr.*, No. CV PX-17-618, 2018 WL 3388351, at *7 (D. Md. July 12, 2018) (finding that "[a]lthough the adverse action in a retaliation action need not affect an employee's 'terms or conditions of employment,' to qualify, verbal warnings, counseling letters, and formal letters of reprimand are still not considered 'adverse employment actions.'").  Nevertheless, there is no dispute that Plaintiff's termination constitutes an adverse action.  At bottom, Defendant argues that Plaintiff fails to produce evidence of a causal connection between each protected activity and Defendant's alleged adverse actions.  (ECF No. 40-1 at p. 31.) Plaintiff asserts that "[t]emporal proximity and a pattern of escalating discipline support a causal link."  (ECF No. 43 at p. 2.)

The record before the court lacks the requisite casual connective tissue between the written warnings Plaintiff received and his subsequent termination, on the one hand, and his internal complaints, request for disability accommodations, or EEOC charge, on the other.  Even assuming Plaintiff could make out a *prima facie* case of retaliation, Defendant articulates a legitimate, non-retaliatory reason for terminating Plaintiff supported by the undisputed record facts: "he left work early without finishing his assigned workload and had a recent and significant history of attendance issues."  (ECF No. 40-1 at p. 32.)  "It is well established that discharging an employee who fails

36

to report to work is a valid, nondiscriminatory reason for termination." *Sherif v. Univ. of Maryland Med. Ctr.,* 127 F. Supp. 3d 470, 482 (D. Md. 2015) (quoting *Wallace v. Rite Aid Corp.*, No. CIV. PJM 10-2190, 2012 WL 366896, at *3 (D. Md. Feb. 1, 2012)).

"To survive summary judgment, [the plaintiff] must rebut that evidence by showing that the proffered reason is, more likely than not, a pretext for discrimination." *Id.* Plaintiff asserts that the timing of his termination in proximity to his protected activities establishes pretext given that Defendant had tolerated similar conduct in the past. (ECF No. 43 at p. 2.) But as Defendant correctly notes, "mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). And, importantly, "temporal proximity alone, while perhaps sufficient to establish causation for the purposes of a *prima facie* case, cannot create a sufficient inference of pretext." *Nathan v. Takeda Pharms. Am., Inc.*, 890 F. Supp. 2d 629, 648 (E.D. Va. 2012), *aff'd,* 544 F. App'x 192 (4th Cir. 2013). "[A] plaintiff alleging employment discrimination under *McDonnell Douglas* cannot rely solely on his 'own assertions of discrimination' to demonstrate that the proffered justification for his termination is pretextual." *Buckmaster v. Nat'l R.R. Passenger Corp.*, No. CV RDB-19-3203, 2022 WL 1081947, at *9 (D. Md. Apr. 11, 2022) (quoting *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 305 (4th Cir. 2016)).

Given the undisputed attendance problems documented by Defendant, including Plaintiff's own deposition testimony as to his policy violations, no reasonable fact finder could conclude that Defendant's legitimate offered reasons for its actions are a pretext for unlawful retaliation. Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

### C. Plaintiff's Motion for Leave to File Surreply

On April 8, 2025, Plaintiff filed the Motion for Leave to File Surreply pursuant to Local Rule 105.2(a). (ECF No. 52.) Plaintiff asserts that his proposed surreply is "narrowly tailored to address" new assertions by Defendant "and to preserve the accuracy and fairness of the record before the [c]ourt." *Id.* at p. 2. In its opposition, Defendant argues Plaintiff had ample notice of the arguments made in Defendant's Motion, chose not to address them in his opposition, and cannot now rely on a surreply to cure his failure to do so. (ECF No. 57 at pp. 3–4.)

Although surreplies are generally not permitted, whether to permit a party to file a surreply is within the court's discretion. *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013), *aff'd in part sub nom.*, 778 F.3d 463 (4th Cir. 2015); Local Rule 105.2(a) (D. Md. 2025) ("Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed."). "This discretion is typically used in the interest of fairness to permit parties to respond to new matters raised for the first time in the opposing parties' reply briefs." *Boland v. Amazon.com Sales, Inc.*, 628 F. Supp. 3d 595, 599 (D. Md. 2022) (citing *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004)). *See Freeman*, 961 F. Supp. 2d at 801 ("Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply.") (citing *Khoury*, 268 F.Supp.2d at 605 (D. Md. 2003)).

This court has also "used this discretion to permit self-represented parties to file surreplies even where no new matters were raised in the reply brief" *Trainor v. McGettigan*, No. CV GLR-22-1505, 2023 WL 403621, at *2 (D. Md. Jan. 25, 2023). *See Carroll v. Porter*, No. CV GLR-23-02960, 2024 WL 3275482, at *4 (D. Md. July 2, 2024) (same); *Boland*, 628 F. Supp. 3d at 599 (same); *Wommack v. Ceres Terminals, Inc.*, No. CV JKB-19-1720, 2019 WL 4393136, at *2 (D.

Md. Sept. 13, 2019) (same).  Importantly, this court has permitted surreplies where a *pro se* plaintiff's surreply did not "unduly prejudice" defendants (including, *e.g.*, where the proposed surreply does not change the outcome of court's decision).  *Williams v. Bartee*, No. CIV.A. CCB-10-935, 2011 WL 2842367, at *2 (D. Md. July 14, 2011), *aff'd sub nom. Williams v. Merritt*, 469 F. App'x 270 (4th Cir. 2012).

In view of these principles, the court will exercise its discretion to provide Plaintiff leave to file his surreply, and will direct that it be docketed.  Plaintiff's surreply does not change this court's analysis; as such, Defendant suffers no prejudice.

## V.    **CONCLUSION**

For the reasons set forth herein, by separate order, the Motion (ECF No. 40) and Plaintiff's Motion for Leave to File Surreply (ECF No. 52) shall be granted.

/S/

March 2, 2026

_____
Julie R. Rubin
United States District Judge